UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KENAI IRONCLAD CORP.                                    CIVIL ACTION

VERSUS                                                  CASE NO. 19-2799

CP MARINE SERVICES, LLC et al.                          SECTION: "G"(2)


**FINDINGS OF FACT, CONCLUSIONS OF LAW & REASONS FOR JUDGMENT**

This matter came before this Court for trial without a jury on February 14, 2022, through February 22, 2022. The Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1333, which confers on the federal district courts original jurisdiction over admiralty and maritime claims, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Venue is proper in this Court under 28 U.S.C. § 1391(b) because the events giving rise to this litigation occurred in this district. The substantive law applicable to this case is the general maritime law because this action concerns a ship repair contract.[1]

The Court has carefully considered the testimony of all of the witnesses and the exhibits entered into evidence during the trial, as well as the record. After reviewing all of the evidence and pursuant to Federal Rule of Civil Procedure Rule 52(a), the Court issues the following findings of fact and conclusions of law. To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

## I.   Background

Plaintiff Kenai Ironclad Corp. ("Plaintiff") filed a Complaint in this Court on March 22,

---

[1] *Todd Shipyards Corp. v. Turbine Serv. Inc.*, 674 F.2d 401, 412 (5th Cir. 1982).

2019.[2] In the Complaint, Plaintiff asserts claims for breach of contract, wrongful vessel seizure, conversion, and tortious interference with contractual relations against Defendants CP Marine Services, LLC ("CP Marine") and Ten Mile Exchange, LLC ("TME") (collectively, "Defendants").[3] These claims arise out of a vessel repair contract Plaintiff allegedly entered with Defendants to convert Plaintiff's vessel, the *M/V Iron Don*, from an offshore supply vessel to a salmon fishing vessel.[4] Plaintiff alleges that it secured a charter for the vessel to fish salmon in Alaska.[5] Plaintiff asserts that Defendants knew that Plaintiff needed the vessel up and running by June 20, 2019, in order to be ready for salmon season.[6] To meet this timeframe, Plaintiff alleges that one of its directors spoke with Joseph Dardar, an officer of CP Marine, who allegedly agreed to allow work on the vessel to proceed while Plaintiff's employees lived aboard the ship.[7]

On January 31, 2019, Plaintiff avers it began to notice billing and work discrepancies.[8] Plaintiff contends that Defendants assured Plaintiff in a conference call they would remediate the issues.[9] Then, on February 18, 2019, Plaintiff asserts that Defendants forcibly evicted Plaintiff's employees from the vessel in violation of the parties' agreement.[10] Plaintiff alleges that Defendants filed a police report stating that the eviction was for non-payment and because the vessel was being

---

[2] Rec. Doc. 1.

[3] *Id.* at 12–14.

[4] *Id.* at 3.

[5] *Id.* at 3–4.

[6] *Id.*

[7] *Id.* at 4.

[8] *Id.* at 6.

[9] *Id.* at 7.

[10] *Id.*

moved into the water from drydock.[11]

Plaintiff asserts that Defendant stopped working on the vessel and refused to allow Plaintiff's employees back aboard.[12] Plaintiff alleges that Defendants' alleged breach jeopardized timely performance of the contract. Plaintiff avers that it has incurred consequential damages from having to house its employees off-site as well as additional expenses from the alleged breach of contract.[13] Plaintiff seeks damages and declaratory judgment that Defendants' vessel seizure was wrongful.[14]

A trial without a jury was held from February 14, 2022, through February 22, 2022.[15] On March 4, 2022, the parties filed post-trial briefing.[16]

## II.   Findings of Fact

### A.    The Parties

Plaintiff Kenai Ironclad Corp. is a Texas corporation that owns and operates the *M/V Iron Don*.[17] Plaintiff-company was founded by Levi and Austin Adler. Levi Adler is the Chief Financial Officer of Kenai.[18] Austin Adler is a master welder who oversees operations of the vessel.[19]

Defendant CP Marine Services, LLC  is a Louisiana limited liability company which owns and operates a shipyard in Marrero, Louisiana. CP Marine is partly owned by Joseph Dardar.

---

[11] *Id.* at 8.

[12] *Id.* at 8–9.

[13] *Id.* at 9–10.

[14] *Id.* at 13–15.

[15] Rec. Docs. 81, 82, 83, 84, 85.

[16] Rec. Docs. 87, 88.

[17] The parties did not contest this fact. *See* Rec. Doc. 70 at 4 (Pretrial Order).

[18] Testimony of Levi Adler.

[19] Testimony of Austin Adler.

3

Defendant Ten Mile Exchange, LLC is a Louisiana limited liability company. Joseph Dardar is also an owner and operator of TME, a shipyard in Marrero, Louisiana.[20]

## B.    *The Salmon Fishing Time Charter*

Plaintiff obtained a salmon fishing time charter on October 18, 2018, from Ocean Beauty Seafoods, LLC ("Ocean Beauty").[21] The charter provided that the start date would be June 25 of each year at Naknek, Alaska.[22] The charter also set a day rate of $5,700.[23] Plaintiff's profit from the charter would be the day rate less any expenses.[24] The costs for the vessel per day were: $1,150 per day in crew wages, $33.90 in insurance, and $1,000 per day in amortized maintenance costs.[25] Therefore, Plaintiff's daily profit on the salmon charter was $3,516.10 per day.[26]

## C.    *The Agreement Between the Parties*

In order to fulfill the charter, Plaintiff purchased an offshore supply vessel, the *M/V GIS Storm*, for $335,000 in 2018 and renamed it the *M/V Iron Don*.[27] Plaintiff purchased the *Iron Don* through Peter Jansen. The *Iron Don* was located at LaRose Safe Harbor.[28] Plaintiff needed to convert the *Iron Don* into a salmon fishing vessel. Plaintiff began looking for a shipyard that could

---

[20] Testimony of Joseph Dardar.

[21] Plaintiff's Exhibit 1.

[22] *Id.*

[23] *Id.*

[24] Testimony of Levi Adler.

[25] Testimony of Levi Adler.

[26] Testimony of Levi Adler; Plaintiff's Exhibits 16, 17.

[27] Testimony of Levi Adler.

[28] Testimony of Levi Adler.

4

dry dock, sandblast, prime, and paint the vessel.[29] Jansen referred Plaintiff to Joseph Dardar.[30] In early December 2018, Plaintiff contacted Dardar to discuss the work to be done on the *Iron Don*. The parties agreed that Plaintiff would come to inspect Dardar's shipyard.[31]

On December 14, 2018, Dardar, through TME, sent Plaintiff a quote for $3,000 to tug the *Iron Don* from LaRose Safe Harbor to the CP Marine dock.[32] On December 20, 2018, TME towed the *Iron Don* from LaRose Safe Harbor to the CP Marine/TME fleet.[33] TME sent an invoice for this tow on the same day, which Levi Adler received on or about December 25, 2018.[34] The invoice indicated that payment was due within thirty days.[35] Levi Adler paid the December 25, 2018 tow invoice on December 27, 2018, via check.[36]

Prior to moving the vessel from LaRose Safe Harbor, CP Marine sent Plaintiff a rate structure sheet.[37] Plaintiff used this rate structure to compare CP Marine's shipyard with other shipyards in Louisiana.[38] Plaintiff found CP Marine's rates to be comparable to other shipyards and decided to meet with CP Marine's representatives.[39]

---

[29] Testimony of Levi Adler.

[30] Testimony of Levi Adler.

[31] Testimony of Levi Adler.

[32] Plaintiff's Exhibit 2.

[33] Plaintiff's Exhibit 3.

[34] *Id.*; Testimony of Levi Adler.

[35] Plaintiff's Exhibit 3.

[36] Testimony of Levi Adler. Defendants deposited this check on January 2, 2019. *See* Defense Exhibit 9 (Deposit Slip from Home Bank); Testimony of Gina Taromina.

[37] Plaintiff's Exhibit 4.

[38] Testimony of Levi Adler.

[39] Testimony of Levi Adler.

On December 26, 2018, Plaintiff's representatives went to lunch with Dardar to discuss what they were looking for in a shipyard.[40] Plaintiff explained that time was of the essence so that Plaintiff could arrive in Alaska in time for the salmon fishing charter. Plaintiff also explained that it was looking for a shipyard that would allow its crew to live aboard the vessel and that would allow Austin Adler to perform hot work on the vessel.[41] Plaintiff ultimately selected CP Marine as its shipyard because CP Marine was willing to allow Plaintiff's crew to live aboard and work on the vessel while the shipyard went about its work. Once the parties had reached an agreement, Plaintiff's crew took up residence on the vessel.[42]

The terms of this oral contract were never reduced to writing. Instead, they were reflected in the invoices sent to Plaintiff by CP Marine. The work to be done on the *Iron Don* by CP Marine consisted of (1) sandblasting, priming, and painting the hull, (2) installing struts on the bottom of the vessel, (3) repairing hatch covers, replacing a portion of the hull's steel, and (4) installing anodes on the vessel's hull.[43] To determine Plaintiff's claims, the Court must resolve three factual disputes regarding the terms of the contract: (1) what quality of sandblasting did Plaintiff request, (2) did the parties agree to a method of payment, and (3) did the parties agree to when payments must be made. The Court makes the following findings as to the terms of the contract.

### 1. Quality of the Sandblasting

Plaintiff chose and selected the paint for the hull in consultation with representatives from the paint manufacturer, Sherwin-Williams.[44] Plaintiff purchased the paint directly from Sherwin-

---

[40] Testimony of Levi Adler; Testimony of Joseph Dardar.

[41] Testimony of Levi Adler.

[42] Testimony of Levi Adler.

[43] Testimony of Levi Adler, Austin Adler, Joseph Dardar.

[44] Testimony of Austin Adler.

Williams. Specifically, Plaintiff selected Seaguard 5000HS epoxy for the first layers and Seaguard Ablative Anti Fouling Coating for the outer layers. These paints called for minimum surface preparation of a "near white metal blast," in accordance with the SSPCSP10/NACE2 industry standard. A near white blast removes virtually all of the old paint and rust. A commercial blast is significantly cheaper than a near-white blast. In a commercial blast, a portion of the existing paint and rust is left on the hull. Plaintiff's expert Robert Galbraith of the Stabbert Marine shipyard in Seattle, testified that approximately 5% to 10% of the old paint and rust is left on the hull in a commercial blast. As Galbraith testified, failing to sandblast to the proper standard means that the paint will not adhere optimally to the hull, risking problems such as delamination of the new paint from the hull and rust. The expected useful working life of a paint job is two to three years.[45] This working life will be reduced when the sandblasting below the recommended quality for the specific paint applied.

The Court finds that Plaintiff requested that CP Marine perform a "commercial blast." Levi Adler testified that Plaintiff requested a rate sheet from CP Marine. That rate sheet reflects a rate of $2.75 per square foot for a "commercial media blast."[46] On January 8, 2019, CP Marine then issued a quote to Plaintiff for all of the work to be performed on the *Iron Don*.[47] That quote indicates a sandblast at a rate of $3.00 per square foot.[48] Levi Adler testified that he attributed this price difference to an increase in quality of the blast.[49] The Court does not credit this testimony because an increase of .25¢ would not account for the difference in cost between a commercial

---

[45] Testimony of Robert Galbraith.

[46] Plaintiff's Exhibit 4.

[47] Plaintiff's Exhibit 5.

[48] *Id.*

[49] Testimony of Levi Adler.

and near white blast. Moreover, CP Marine performed repairs on the vessel in January and February of 2019. This work is reflected in two invoices issued on January 31, 2019, and February 27, 2019.[50] These invoices reflect that the total cost to blast prime and paint the hull was $32,370. Joseph Dardar testified that a near white blast would have cost at least $120,000 for the size of the vessel. Further, a Sherwin-Williams vessel survey from October 25, 2019 indicates that CP Marine "was hired to perform a . . . [c]ommercial blast."[51] Given this evidence and testimony, as well as Galbraith's testimony that commercial blasts are significantly cheaper, the Court finds that Plaintiff requested a commercial blast.

### 2. Method of Payment

The invoices the Court has reviewed indicate there was no requirement for payment by wire. Each of the invoices sent to Plaintiff before March 6, 2019 direct the recipient to "[r]emit check payments to above company name and address."[52] Plaintiff paid the December 14, 2018 tow invoice by check without issue or complaint from Defendants.[53] Plaintiff also paid the January 5, 2019 invoice by check without issue or complaint from Defendants.[54]

### 3. Timing of Payment

The Court also concludes that there was no course of dealing between the parties adequate to make "due upon receipt" a term of the contract between the parties. There was no such term in the original quote from CP Marine, and Plaintiff never agreed to the term. Further, Plaintiff testified that it paid at least two invoices by check without issue. Plaintiff paid the December 20,

---

[50] Defense Exhibit 8.

[51] Plaintiff's Exhibit 31.

[52] *See* Defense Exhibit 8.

[53] Testimony of Levi Adler, Gina Taromina. Defense Exhibit 9.

[54] Defense Exhibit 9.

2018 invoice by check on December 27, 2018.[55] Plaintiff also paid the January 5, 2019 invoice by check on February 4, 2019.[56] CP Marine invoiced Kenai on January 31, 2019, for the work performed to date. CP Marine put on its invoice "due upon receipt." Based on that, CP Marine, through Joseph Dardar, demanded that Plaintiff immediately make payment on any invoice received. The Court finds that the modification of this term was not effective to alter the course of dealing between the parties. Therefore, the Court finds that payment was due within a reasonable time after receipt of invoices.

**D.**   ***The Work on the Vessel***

The Vessel was placed on dry dock on January 5, 2019. That same day, CP Marine sent an invoice to Plaintiff for the $2,000 dry docking fee.[57] Plaintiff paid this invoice by check, which CP Marine deposited on February 4, 2019.[58]

Work commenced on the *Iron Don* in January 2019. Defendant sent two invoices for this work: one on January 31, 2019 for $44,455.00 and a second on February 7, 2019 for $10,401.15.[59]

In January 2019, Levi Adler visited the *Iron Don*. Levi Adler viewed the paint job in person for the first time. Levi Adler developed concerns about the quality of the workmanship. Levi Adler expressed those concerns to Dardar and asked for a written guarantee of the quality of the workmanship. On February 13, 2019, Levi Adler sent an email reiterating Plaintiff's request for a written guarantee from CP Marine for the quality of repair work being done—specifically, the

---

[55] Plaintiff's Exhibit 3; Defense Exhibit 9.

[56] Defense Exhibits 8, 9.

[57] Defense Exhibit 8.

[58] Defense Exhibit 9.

[59] Defense Exhibit 8.

welding, blasting, and paint.[60] The next day, on February 14, Levi and Austin Adler had a conference call with Dardar and B.J. Creppel. On that call, Plaintiff again requested a written guarantee for the work performed on the vessel. Dardar and Creppel told Plaintiff they needed to talk to "Sam" before giving such a written guarantee.[61] A few days later, on February 18, Levi Adler spoke to Dardar and Creppel again. Creppel, on behalf of CP Marine, told Levi Adler that CP Marine would not provide a written guarantee because a judge would see that guarantee differently than CP Marine did. CP Marine then demanded immediate payment on the outstanding invoices from January 31 and February 7. Levi and Austin Adler decided to pay the invoice and end the working relationship with Defendants as soon as possible.[62] That same day, Plaintiff wired $54,856.15 to Defendants, satisfying the January 31, 2019 and February 7, 2019 invoices.[63]

At 6:20 PM the following day, February 19, Gina Taromina of CP Marine emailed a letter to Plaintiff.[64] The letter demanded that all of Plaintiff's crew immediately vacate the vessel and Defendants' shipyard. The letter further demanded that all of Plaintiff's equipment be removed from the shipyard. The letter states that failure to comply will result in a $1,000 daily storage fee. Finally, the letter threatened to remove the vessel from dry dock and return it to the water. The letter stated that a $5,000 per day vessel storage fee would be imposed once the vessel was in the water. Shortly after, Levi Adler received a phone call from John Tingley, a laborer living and working aboard the *Iron Don*. Mr. Tingley told Levi Adler that Jefferson Parish sheriffs were

---

[60] Plaintiff's Exhibit 9.

[61] Testimony of Levi Adler.

[62] Testimony of Levi Adler, Austin Adler.

[63] The parties stipulated to this fact at trial. *See* Testimony of Gina Tarmoina. *See also* Testimony of Levi Adler, Austin Adler, Joseph Dardar; Defense Exhibit 9.

[64] Plaintiff's Exhibit 10.

present and ordering Plaintiff's crew off the vessel.

After evicting Plaintiff on February 19, CP Marine completed the remainder of the work on the vessel. On February 27, 2019, CP Marine sent one final invoice to Plaintiff for $21,435.[65] Austin Adler immediately wrote a check for the final invoice and delivered it to CP Marine, which CP Marine deposited the same day.[66] This payment satisfied all outstanding CP Marine invoices to Plaintiff.[67] Austin Adler called Plaintiff's bank to confirm that the check had cleared. Mr. Dye, a representative from Plaintiff's bank, confirmed that Defendant had cashed the check and that it cleared on February 28, 2019.

**E.      _The Vessel Seizure_**

Six days later, on March 5, 2019, Plaintiff came to pick up the _Iron Don_ from CP Marine's facility. Austin Adler was accompanied by John Phillips of Tom's Marine and Salvage in Tom Dinh's vessel the _Super T_.[68] However, Dardar, now operating the _M/V Aunt Di_, a vessel owned and operated by TME, and acting in his capacity with TME, drove the _Aunt Di_ across the waterway, ramming into Dinh's vessel the _Super T_.[69] This ramming pinned the _Super T_, preventing Plaintiff from retrieving its vessel.

Dardar spoke to Austin Adler, verbally threatening Adler. Dardar told Austin Adler that he could not retrieve Plaintiff's boat until after the check had cleared. Dardar testified that his bank informed him that it would take "up to seven days" for Plaintiff's check to clear. Plaintiff testified that they had previously paid invoices by check without any mention of a requirement that a check

---

[65] Defense Exhibit 8.

[66] Testimony of Levi Adler, Austin Adler, Gina Taromina.

[67] Testimony of Gina Taromina.

[68] Testimony of Tom Dinh.

[69] Plaintiff's Exhibit 22.

"clear" Defendants' bank.[70] The Court specifically finds that by this date Plaintiff had paid two different invoices through check: (1) the December 25, 2018 invoice, paid on December 27, 2018; and (2) the January 5, 2019 invoice, paid on February 4, 2019.[71] Defendants produced no evidence that these check payments did not clear or were cancelled. Additionally, Plaintiff testified that its own bank confirmed that the check had cleared, and the funds had been removed from Plaintiff's account.[72] Further, Dinh testified that he received several payments from Plaintiff by check and that all the checks cleared without issue and Plaintiff never attempted to cancel a check after remitting payment.[73] Therefore, the Court does not credit Dardar's testimony that he was concerned Plaintiff might cancel the check and that funds would be removed from his account.

The day after the March 5, 2019 ramming, Plaintiff received an invoice for $20,750 from TME.[74] Prior to this invoice, Plaintiff had received only one invoice from TME for the December 2018 towing, which was paid in full.[75] All other invoices came from CP Marine.[76] The TME invoice reflected that it was issued "due to events that occurred on 3/5."[77] The invoice stated that payment must be received by wire transfer by "close of bank business (3:00 pm CST)" on March 8, 2019.[78] At this point in the business relationship, Plaintiff had no formal business relationship

---

[70] Testimony of Levi Adler.

[71] Testimony of Gina Taromina. *See also* Defense Exhibit 9.

[72] Testimony of Levi Adler, Austin Adler.

[73] Testimony of Tom Dinh.

[74] Plaintiff's Exhibit 12.

[75] Testimony of Levi Adler, Gina Taromina.

[76] Testimony of Levi Adler, Gina Taromina.

[77] Plaintiff's Exhibit 12.

[78] *Id.*

with TME and owed no debt to TME. Additionally, Dardar admitted at trial that he never intended to collect on this invoice and "should never have sent it."[79] Dardar also testified that he had arrested vessels before and was familiar with the proper procedure to arrest a vessel.[80] Therefore, the Court finds that Dardar sent this invoice for the sole purpose of intimidating and threatening Plaintiff.

## F.    *Events After Plaintiff Retrieved the Iron Don*

Between remitting final payment on February 28, 2019, and returning to retrieve the vessel on March 5, 2019, Plaintiff contacted other shipyards to find a new yard to move the *Iron Don*. Plaintiff was put in contact with Tom Dinh, owner of Tom's Marine and Salvage in Lafitte, Louisiana. Dinh agreed to tug the *Iron Don* to his shipyard and allow Plaintiff to finish work on the vessel. Plaintiff ultimately retrieved the *Iron Don* and left the CP Marine shipyard on March 11, 2019.

Plaintiff's charter agreement with Ocean Beauty required Plaintiff to be at the charterer's facility in Naknek, Alaska, by June 25, 2019.[81] After the vessel left CP Marine, it was transported to Tom's Marine and Salvage. Austin Adler testified that Plaintiff's timeline for getting to Alaska was "still on track" when the *Iron Don* left CP Marine's shipyard. The *Iron Don* remained at Tom's Marine and Salvage for two months awaiting additional repairs.[82] One such repair was the installation of new engines. These engines did not arrive at Tom's Marine and Salvage until April 8, 2019.[83] The *Iron Don* left Tom's Marine and Salvage on May 11, 2019.[84] Plaintiff arrived in

---

[79] Testimony of Joseph Dardar.

[80] Testimony of Joseph Dardar.

[81] Plaintiff's Exhibit 1.

[82] Testimony of Tom Dinh.

[83] Testimony of Austin Adler.

[84] Testimony of Levi Adler.

Seattle in May of 2019, where the *Iron Don* required additional outfitting and repairs. After those repairs were completed, the vessel departed Seattle bound for Alaska. These additional repairs at Tom's Marine and Salvage and in Seattle were not part of Plaintiff's contract with Defendants. Therefore, based on the over two-month delay in completing this additional work, the Court finds that Plaintiff has not met its burden to show that Defendants' allegedly dilatory performance caused its late arrival in Alaska.

### III.  Conclusions of Law

*A.*   ***Breach of Contract***

"[I]t is an established rule of ancient respectability that oral contracts are generally regarded as valid by maritime law."[85] The interpretation of a maritime contract is a question of law.[86] "When interpreting maritime contracts, federal admiralty law rather than state law applies."[87] "In maritime contract disputes, federal courts apply general principles of contract law. However, to the extent that it is not inconsistent with admiralty principles, state contract law may be applicable to maritime contracts."[88] A plaintiff suing on a contract, whether written or oral, must establish the basic elements of a contract—namely, offer, acceptance and consideration.[89]

Oral contracts are valid under maritime law.[90] Maritime service contracts contain an

---

[85] *Kossick v. United Fruit Co.*, 365 U.S. 731, 734 (1961).

[86] *Barrios v. Centaur, LLC*, 942 F.3d 670, 680 (5th Cir. 2019).

[87] *LLOG Expl. Co. v. Signet Mar. Corp.*, 673 F. App'x 422, 425 (5th Cir. 2016) (quoting *Int'l Marine, LLC v. Delta Towing, LLC*, 704 F.3d 350, 354 (5th Cir. 2013)).

[88] *In re Tasch, Inc.*, 46 App'x 731, 2002 WL 1973464, at *2 (5th Cir. July 31, 2002) (citation omitted).

[89] *Id.* at *2.

[90] *Kossick*, 365 U.S. at 734 ("[I]t is an established rule of ancient respectability that oral contracts are generally regarded as valid by maritime law."). *See also Marine Office of Am. Corp. v. M/V Vulcan*, 891 F. Supp. 278, 287 (E.D. La. 1995).

14

implied warranty of workmanlike performance.[91] This warranty requires that a maritime service contractor perform in a workmanlike manner, exercising the "degree of diligence, attention, and skill which is adequate to complete a task."[92]          The Court concludes that Plaintiff has not carried its burden to show that Defendants breached the implied warranty of workmanlike performance. There is no evidence that Plaintiff entered into a contract with Defendant Ten Mile Exchange, LLC. Therefore, there was no contract for Defendant Ten Mile Exchange, LLC to breach.

Although the Court finds that Plaintiff did enter an oral contract with Defendant CP Marine, the Court further finds that CP Marine completed the repairs with the "degree of diligence, attention, and skill . . . adequate to complete [the] task."[93] Specifically, given the Court's finding that Plaintiff requested a commercial blast, the Court concludes that Defendant did not breach the implied warranty of workmanlike performance. Plaintiff's expert Galbraith testified that commercial blasts leave behind a portion of the old paint and rust on the hull. Galbraith further testified that this will cause issues with the paint adhering to the hull. Similarly, Galbraith testified that the expected lifespan of a paint job is two to three years, which will decrease if a vessel is not properly sandblasted. Levi Adler testified that Plaintiff plans to repaint the vessel in the fall of 2022.[94] Thus, the Court finds that Plaintiff has received the average expected lifespan of a paint job and has not shown a deficient performance on the part of Defendants. Therefore, the Court

---

[91] *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124 (1956) *superseded by statute on other grounds*, 33 U.S.C. § 905. *See also Emps. Ins. of Wausau v. Suwanne River Spa Lines, Inc.*, 866 F.2d 752, 763 n.17 (5th Cir. 1989).

[92] *Cont'l Ins. Co. v. Bollinger Quick Repair, LLC*, No. 18-2810, 2021 WL 1313406, at *2 (E.D. La. 2021) (Barbier, J.) (quoting Thomas J. Schoenbaum, Admiralty & Maritime Law § 5:14 (6th ed. 2019)).

[93] *Cont'l Ins. Co.*, 2021 WL 1313406, at *2.

[94] Testimony of Levi Adler.

finds that Levi Adler's testimony that paint was chipping off of the hull is due to the suboptimal sand blast ordered by Plaintiff and not by Defendants' deficient workmanship. Accordingly, the Court finds in favor of Defendants on Plaintiff's breach of contract claims.

### B.    *Wrongful Arrest and Conversion*

"To succeed on a claim for wrongful arrest of a vessel, the claimant must establish that the seizure was (1) pursuant to an invalid maritime lien and (2) committed with bad faith, malice, or gross negligence."[95] An oral contract for repairs can give rise to a maritime lien.[96] Once a debt is repaid, the lien ceases to exist.[97] Here, the Court concludes Defendants' seizure was pursuant to an invalid maritime lien. At the time Defendants rammed and detained Plaintiff's vessel, Defendants had completed all repairs and Plaintiff had fully paid for the contract. Therefore, any maritime lien over the vessel had ceased. Thus, Defendants no longer had a valid maritime lien.

"The gravamen of the right to recover damages for wrongful seizure or detention of vessels is the bad faith, malice, or gross negligence of the offending party."[98] The Fifth Circuit has explained that bad faith damages in the wrongful arrest context are "analogous to those in cases of malicious prosecution."[99] In the context of malicious prosecution:

> The defendant is required to respond in damages for causing to be done through the process of the court that which would have been wrongful for him to do himself, having no legal justification therefor and acting in bad faith, with malice, or through

---

[95] *El Paso Prod. Gom, Inc. v. Smith*, 2009 A.M.C. 1733, 1733 (E.D. La. 2009) (Vance, J.) (citing *Frontera Fruit Co. v. Dowling*, 91 F.2d 293, 297 (5th Cir. 1937)).

[96] *Constructive Hands, Inc. v. Baker*, 446 F. Supp. 2d 88, 92–93, 97 (N.D.N.Y. 2006).

[97] *World Fuel Servs., Inc. v. Magdalena Green M/V*, 464 Fed. App'x 339, 341 (5th Cir. 2012) (citing *Mullane v. Chambers*, 438 F.3d 132, 138 (1st Cir. 2006); *Maritrend, Inc. v. M/V Sebes*, No. 96-3140, 1997 WL 660614, at *2 (E.D. La. Oct. 23, 1997)).

[98] *Frontera Fruit Co.*, 91 F.2d at 297.

[99] *Id.*

16

a wanton disregard of the legal rights of his adversary.[100]

The Fifth Circuit has held that a party acted in good faith when there was a "bona fide dispute over the validity of [the] lien" and "the parties could have legitimately and honestly believed that the lien would stand up."[101] But a court may infer bad faith from a lack of probable cause for a plaintiff's claims.[102] Additionally, state law can supplement federal maritime law with regard to self-help.[103] Louisiana, following the well-established civil law tradition, abhors self-help in creditor-debtor relationships.[104] This is particularly true for vessels, where the lien-holder has the right to arrest the vessel.[105]

The Court finds that Defendants acted with bad faith. Defendants detained the vessel pursuant to an invalid maritime lien. When Defendants rammed and detained Plaintiff's vessel, they acted with callous disregard for the safety of the people aboard the vessels. Defendants threatened Plaintiff by sending a $20,750 invoice from TME for ramming and detaining the *Iron Don*. That invoice demanded payment within two days. Further, Dardar testified he never intended to collect this invoice, effectively conceding that it was an intimidation tactic. Dardar also testified he was familiar with the proper procedure to arrest a vessel, but nevertheless took matters into his own hands to prevent Plaintiff from retrieving its vessel. Therefore, the Court finds these actions

---

[100] *Id.*

[101] *See Cardinal Shipping Corp. v. M/S Seisho Maru*, 744 F.2d 461, 475 (5th Cir.1984).

[102] *See Stewart v. Sonneborn*, 98 U.S. 187, 196–97 (1878).

[103] *See Dietrich v. Key Bank, NA*, 72 F.3d 1509, 1513 (11th Cir. 1996).

[104] *Price v. U-Haul Co. of La.*, 09-1959 (La. 9/8/99); 745 So. 2d 593, 599.

[105] *See* George Rutherglen, *The Contemporary Justification for Maritime Arrest and Attachment*, 30 Wm. & Mary L. Rev. 541, 562 (1989) ("Because creditors usually cannot seize a vessel without breach of the peace, they must rely on arrest and attachment as alternatives to self-help remedies like repossession.").

to be in bad faith and with "wanton disregard of the legal rights of" Plaintiff.[106] Therefore, Plaintiff is entitled to recover damages.

## C.    *Damages*

Given the findings of fact and conclusions of law in this opinion, the Court hereby finds the damages as follows.

### 1.  Contract claims

Plaintiff requests damages for a replacement paint job, missed contract days, and mooring costs arising from Defendants' alleged breach of contract. Because the Court concludes that Defendants did not breach the contract, Plaintiff cannot recover for these damages.

### 2.  Wrongful arrest/detention

Plaintiff also requests damages for the wrongful arrest and detention of its vessel.[107] The owner of a wrongfully arrested vessel is entitled to recover attorney's fees, expert fees, expenses, and court costs.[108] Additionally, "[p]unitive damages . . . may be recovered when a wrongdoer has acted willfully and with gross disregard for the plaintiff's rights."[109] Although the Court finds that Defendants' performance was not dilatory and did not cause Plaintiff's late arrival in Alaska, Defendants' wrongful detention of Plaintiff's vessel plainly delayed Plaintiff by five days. Therefore, as a measure of punitive damages, the Court will award Plaintiff the value of its missed

---

[106] *Frontera Fruit*, 91 F.2d at 297.

[107] In its post-trial briefing, Defendants assert that Plaintiff cannot recover punitive damages because Plaintiff did not request those damages in the pretrial order. Rec. Doc. 88 at 25. Federal Rule of Civil Procedure 54(c) provides that every "final judgment should grant the relief to which each party is entitled, *even if the party has not demanded that relief in its pleadings*." Fed. R. Civ. P. 54(c) (emphasis added). Therefore, Plaintiff is entitled to recover punitive damages for its wrongful arrest claim even if Plaintiff did not request that relief in the pretrial order.

[108] *In re Merry Shipping, Inc.*, 650 F.2d 622, 624 (5th Cir. Unit B July 1981), *overruled on other grounds*, *The Dutra Group v. Batterton*, 139 S. Ct. 2275 (2019). *Vaughan v. Atkinson*, 369 U.S. 527, 530 (1962); *Frontera Fruit*, 91 F.2d at 297; *Cardinal Shipping Corp.*, 744 F.2d at 474.

[109] *Id.* (citing *Gore v. Turner*, 563 F.2d 159, 164 (5th Cir. 1977)).

contract days for the days that Defendants wrongfully detained the vessel. Specifically, the vessel was detained for five days from March 5, 2019 to March 11, 2019. The net day rate for the salmon fishing charter was $3,516.10. This rate, multiplied by the five days the vessel was detained, is $17,580.50. Accordingly, the Court awards Plaintiff attorney's fees, expert fees, expenses, court costs, as well as punitive damages in the amount of $17,580.50.

### 3.   Prejudgment and post-judgment interest

"As a general rule, prejudgment interest should be awarded in admiralty cases."[110] The "[d]iscretion to deny prejudgment interest is created only when there are 'peculiar circumstances' that would make it inequitable for the losing party to be forced to pay prejudgment interest."[111] Here, there are no peculiar circumstances that would make it inequitable for Defendants to pay prejudgment interest. Therefore, Plaintiff is entitled to prejudgment interest.

In the Fifth Circuit, "prejudgment interest is ordinarily awarded from the date of the loss."[112] "Admiralty courts in setting the[] rates [of prejudgment interest] have broad discretion and may look to state law or other reasonable guidelines indicating a fair level of compensation."[113] Given that this Court sits in Louisiana, and the incident giving rise to this judgment occurred in Louisiana, the Court will apply the Louisiana prejudgment interest rate.[114] Prejudgment interest will commence from the date the Court finds that the *M/V Iron Don* was seized, namely, March 5, 2019. Finally, post-judgment interest shall be assessed as provided in 28 U.S.C. § 1961.

---

[110] *Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. 1980).

[111] *Id.* at 728–29.

[112] *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986).

[113] *Id.*

[114] The Louisiana rate of legal interest is fixed by Louisiana Revised Statute § 9:3500.

## IV.   <u>Conclusion</u>

For the reasons stated above, this Court finds that Plaintiff has not shown that Defendants breached the contract. However, Plaintiff has shown that Defendants wrongfully seized the *Iron Don* and acted in bad faith. Accordingly,

**IT IS ORDERED, ADJUDGED AND DECREED** that there be judgment in favor of Plaintiff Kenai Ironclad Corp. and against Defendants CP Marine Services, LLC and Ten Mile Exchange, LLC in the amount of $17,580.50, plus expert fees, expenses, court costs, and reasonable attorney's fees.

**IT IS FURTHER ORDERED** that Defendants pay pre-judgment interest in accordance with La. R.S. § 9:3500 from March 5, 2019, to the date of judgment, and post-judgment interest in accordance with 28 U.S.C. § 1961(a).

**IT IS FURTHER ORDERED** that the matter of attorney's fees is hereby **REFERRED** to the magistrate for an evidentiary hearing, if necessary, to determine the reasonableness of said fees, with the magistrate to prepare a report and recommendation on that issue for the Court.

**NEW ORLEANS, LOUISIANA**, this 17th day of May, 2022.

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

20